KIRBY, J.,
Dissents with Reasons.
|,I respectfully dissent from the majority opinion and would reverse the judgment of the trial court. After a thorough review of the record, I find the plaintiff, Ullah, Inc., failed to prove a looting loss, separate and apart from its compensated flood loss.
At the time of Hurricane Katrina, Ullah had in effect two insurance policies. The first, a commercial business policy issued by defendant, Lafayette Insurance Company, insured Ullah’s A.K. Food Store building and the contents therein against wind, hail, looting and other perils, but not floods.[1] The Lafayette policy provided coverage limits of $262,000.00 on the building and $540,000.00 on the contents.
The second, a flood insurance policy issued by Fidelity National Property and Casualty Insurance Company (“Fidelity”) pursuant to the National Flood Insurance Program (“N.F.I.P.”), covered the contents of the A.K. Food Store building to the limit of $500,000.00.[2]
When the Khans returned to St. Bernard and discovered the damage in late September 2005, Ullah filed a wind claim with Lafayette. Lafayette assigned the 12claim to Property Loss Consulting, Inc. (“PLC”), and Jerrell Fleming, an adjuster, inspected the premises on October 15, 2005. Shortly thereafter, it was determined that the wind damage did not exceed the deductible.
Meanwhile, unbeknownst to Lafayette, Ullah also filed a flood claim with Fidelity. In connection with the flood claim, Ullah submitted to Fidelity a list that included a description and estimated value of the contents and inventory of A.K. Food Store on the date of Hurricane Katrina. The total value of the listed items was $1,261,550.00. After an independent adjuster inspected the premises in October 2005, Fidelity determined that A.K. Food Store sustained a total loss of its inventory and contents, amounting to $1,161,550.00, as a result of the flood. In December 2005, Fidelity paid Ullah the $500,000.00 policy limits to settle the flood claim.[3]
In January 2006, after Ullah had settled the flood claim for the policy limits and the wind claim adjustment yielded minimal damage, and three months after the store premises had been gutted and its contents completely discarded, Ullah notified Lafayette that it wanted to file a looting claim for inventory allegedly looted during the *1206 hurricane. Lafayette informed Ullah that to initiate the claim it first had to submit a copy of a police report from the St. Bernard Parish Sheriffs Office, documenting the dates of the theft and the property taken, as well as a detailed list of the stolen items, their replacement value, and proof of ownership.
As required, Ahmedullah Khan filed a complaint with the St. Bernard Sheriffs Office on January 9, 2006, and reported the following items as stolen:
Tobacco products $250,000.00
Jewlery (sic)/watehes $ 40,000.00
Imported Cigars $ 25,000.00
Phone cards $ 25,000.00
Gift items $ 13,000.00
Zippo lighters $ 4,700.00
^Groceries $ 8,000.00
Fishing Equipment $ 5,000.00
Knives $ 5,000.00
Total Value Lost to Looting $375,700.00
Ullah then filed the looting claim and submitted a copy of the police report to Lafayette in February 2006.
Several months later, Ullah submitted to Lafayette an itemized list that included the description and estimated value of the contents of the A.K. Food Store on the date of Hurricane Katrina.[4] The estimated value of the listed items totaled $1,208,660.00.
In September 2006, after Lafayette discovered that Ullah had, in fact, settled a flood claim on the contents of the A.K. Food Store with Fidelity for the $500,000.00 policy limits, it adjusted the looting claim accordingly and issued a check to Ullah in the amount of $40,000.00 to satisfy the claim.[5] Ullah cashed the check on October 13, 2006.
In June 2007, Ullah filed a suit against Lafayette, alleging that it arbitrarily and capriciously failed to properly adjust the looting claim and pay the full amount of damages under the policy for the looting loss. Lafayette does not dispute that Ul-lah had approximately $1.1 to $1.2 million in inventory on hand at the A.K. Food Store in Chalmette at the time of Hurricane Katrina. Rather, it contends that Fidelity, in adjusting the flood claim, had assessed the total value of the food store’s damaged inventory at $1,161,550.00, attributed the total loss to the flood, and paid Ullah the $500,000.00 flood policy limit. Lafayette further argues that by haccepting the flood policy limit from Fidelity, Ullah tacitly confirmed that the damages identified were caused by the flood and, although Ullah’s receipt of damages under the flood policy did not preclude Ullah from making a looting claim under the commercial business policy, it did preclude Ullah from recovering for the *1207 same loss by re-characterizing the same damages as a looting loss.
After reviewing the testimony and evidence in the record, I believe the jury clearly erred in finding Ullah had sustained a loss of $450,000.00 in inventory as a result of looting during and after Hurricane Katrina. At trial, Ullah had the burden to prove, as it alleged, that $375,700.00 in inventory was stolen. The evidence Ul-lah offered at trial, including the tax records, financial statements, wholesale invoices, inventory descriptive lists, as well as the testimony from the Khans and their employees, merely established that the food store had approximately $1.1 to $1.2 million in inventory at the time of Hurricane Katrina, a fact Lafayette does not dispute. The detailed inventory descriptive list that Ullah submitted to support the looting claim is nearly identical to the inventory list that it submitted to Fidelity on the flood claim. Regarding the St. Bernard Parish Sheriffs Office report in evidence, which the majority finds constitutes Ullah’s proof of segregating its looting loss, Mr. Khan’s narrative therein is clearly self-serving and not supported by any independent evidence, such as an affidavit from an eye witness to the looting or a similarly filed looting complaint from another business or homeowner in the area.
In affirming the jury’s findings, the majority references the report from Mr. Fleming, the PLC adjuster who initially adjusted the wind claim for Lafayette and estimated that Ullah had lost approximately $395,000.00 of inventory to looting. Because Mr. Fleming never testified at the trial, we do not know how or why he arrived at that figure. Nonetheless, the claim notes from the Lafayette file, which are in evidence, indicate that Mr. Fleming initially reported to Lafayette that the | ¡-.looting took place before the flooding oe-curred in St. Bernard Parish several days after the hurricane. Clearly, that was not the case. Even the Khans readily admitted that St. Bernard Parish was completely inundated with water within hours of the hurricane hitting land. Again, because Mr. Fleming was not available to testify, we cannot ascertain why he reported such inaccurate information.
The majority opinion also points out that the photographs in evidence support the jury’s finding that $450,000.00 in inventory was looted. The photographs, taken by the insurance adjusters in early October 2005, before the store was gutted and cleaned, depict the shelves, display cases and merchandise in total disarray. Interestingly, the ATM cash machine was not broken into and remained in the store. Several of the jewelry display cases were still upright and locked. Although Ullah claimed tobacco products constituted the bulk of the looted inventory, the photographs show cases filled with cartons of cigarettes turned over and strewn about the store. Also, Ahmedullah Khan admitted on cross-examination that, when he returned in late September after the hurricane, the store’s “salon” or cigarette storage area was still securely locked and the stored cigarettes were still there. Fidelity’s flood adjuster also testified that that was the case.
The majority states that affirming the jury’s finding does not amount to a “double recovery” for Ullah because Ullah never recovered the full extent of its property loss. But, the reason it did not is because the Fidelity flood policy limit was insufficient to cover the full value of the contents.
Furthermore, nothing in the record indicates that Ullah ever segregated the damages between inventory lost due to the flood and that lost to looting. In fact, Ahmedullah Khan admitted at trial that no attempt was made to segregate the dam *1208 ages between flood and looting. The N.F.I.P. Final Report, which Ullah did not dispute, clearly indicates that Fidelity considered that complete inventory list in | (¡adjusting the flood claim and attributing the total loss to the flood. Ullah’s receipt of damages under the flood policy did not preclude Ullah from making a looting claim under the commercial business policy, but it did preclude Ullah from recovering for the same damages by re-characterizing them as a looting loss.
Because I do not find Ullah offered sufficient proof of a looting loss separate and apart from its flood loss, I believe the jury clearly erred in finding Ullah was entitled to additional damages under the Lafayette policy and would reverse the trial court judgment.

.The Lafayette commercial business policy listed the named insured as “Ullah, Inc. d/b/a A.K. AMOCO New Orleans East Chevron.” In addition to insuring the A.K. Food Store in Chalmette, the policy covered Ullah’s A.K. Amoco New Orleans East Chevron Store located at 10422 Chef Menteur Highway.

. The Khans had purchased that maximum amount of flood coverage allowed under the N.F.I.P. for building contents — $500,000.00.

. Less non-recoverable depreciation of $46,695.10 and the $500.00 deductible, Ul-lah’s covered loss amounted to $1,114,855.90, which exceeded the policy limits by $614,355.90.

. Save for an Icee machine and hot coffee machine, the listed items were identical to those on the list given to Fidelity for the flood claim. However, the designated dollar value amounts of nine of the listed items differ between the two lists. For example, the sterling silver jewelry is valued at $45,000.00 on the Lafayette list and at $57,000.00 on the Fidelity list; cigars are valued at $300.00 on the Lafayette list and at $78,000.00 on the Fidelity list; the ATM machine is valued at $7,200.00 on the Lafayette list and at $3,500.00 on the Fidelity list.

. Lafayette calculated the looting loss as follows: $1,208,660.00 (Ullah’s estimated value of the inventory on August 28, 2009) less $1,161,550.00 (Fidelity's assessed value of the total inventory loss due to flood) less $8,500.00 (the value of an AMOCO sign that was included on the inventory list but was not covered because it was not attached to the A.K. Food Store building), thus leaving $38,610.00 in inventory lost from looting. The record indicates that in addition to tendering $40,000.00 to satisfy the looting claim on the A.K. Food Store, Lafayette had tendered the policy limits of $108,200.00 (less the $1,000.00 deductible) to satisfy Ullah's looting claim on the A.K. Amoco New Orleans East Chevron Store, which did not flood.